UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

JOSEPH HARRIS AYMOND, JR.          CIVIL ACTION NO. 6:21-cv-01161

VERSUS                             JUDGE JUNEAU

COMMISSIONER OF THE SOCIAL         MAGISTRATE JUDGE HANNA
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, and for the reasons set forth below, it is recommended that the Commissioner's

decision should be affirmed.

## Administrative Proceedings

Joseph Harris Aymond, Jr., fully exhausted his administrative remedies before

initiating this action.   He filed an application for disability insurance benefits,

alleging disability beginning on September 29, 2009.[1]  His application was denied.[2]

He then requested a hearing, which began on June 2, 2020 and was completed on

September 15, 2020 before Administrative Law Judge Luke Liter.[3]  Judge Liter

---

[1]     Rec. Doc. 9-1 at 195.

[2]     Rec. Doc. 9-1 at 96.

[3]     Transcripts of the hearings are found in the record at Rec. Doc. 9-1 at 50-69, 72-85.

issued a decision on September 30, 2020, concluding that Mr. Aymond was not disabled within the meaning of the Social Security Act from his alleged disability onset date through September 30, 2010, the date on which he was last insured.[4]  Mr. Aymond asked the Appeals Council to review the ALJ's decision, but the Appeals Council found no basis for review.[5]  Therefore, the ALJ's decision became the final decision of the Commissioner.[6]  Mr. Aymond now seeks judicial review of the Commissioner's decision.

## **Summary of Pertinent Facts**

Mr. Aymond was born on June 9, 1966.[7]  He obtained a GED in 1981[8] and has work experience building industrial scaffolding, painting, and sandblasting.[9]  He alleged that he became disabled on September 29, 2009[10] due to a torn anterior cruciate ligament ("ACL") in his right knee, problems with his left knee, herniated discs in his back, and depression.[11]

---

[4]     Rec. Doc. 9-1 at 19-25.

[5]     Rec. Doc. 9-1 at 5.

[6]     *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[7]     Rec. Doc. 9-1 at 55, 195.

[8]     Rec. Doc. 9-1 at 218.

[9]     Rec. Doc. 9-1 at 55-59, 218.

[10]    Rec. Doc. 9-1 at 195.

[11]    Rec. Doc. 9-1 at 655.

The critical issue is whether Mr. Aymond became disabled on or before September 30, 2010, the date on which he was last insured for Social Security disability benefits.  Because this Court concludes that there was substantial evidence in the record supporting the Commissioner's decision that the claimant was not disabled before his date last insured, the medical records and treatment notes for the time period after the date last insured are not summarized in detail, below.  However, those records were carefully reviewed by this Court.

Mr. Aymond saw Dr. James L. Bellone at Gulf Coast Occupational Medicine, Inc. on September 29, 2009, the date of his accident.[12]  Dr. Bellone explained[13] that when he first saw Mr. Aymond, "the only real abnormality was mild pain along the medial joint line."  X-rays were normal and there was no swelling, contusion, effusion, or ligamentous laxity.  Dr. Bellone diagnosed a mild knee strain and prescribed Naproxen.  He advised Mr. Aymond to wear an elastic knee sleeve and released him to go back to work on the ground level only.  When Dr. Bellone saw Mr. Aymond again on October 6, 2009, Mr. Aymond reported having worked out the remainder of the previous week with no complaints of pain or other problems.  However, Mr. Aymond stated that his knee felt worse and complained of increased pain on palpation of the medial joint line as well as posterior joint pain, which was

---

[12]     Rec. Doc. 9-1 at 644-646.

[13]     Rec. Doc. 9-1 at 641.

a completely new symptom.  Examination showed no evidence of joint laxity, no external evidence of trauma, no effusion, and normal function of the joint.  Because Mr. Aymond was in his forties, however, Dr. Bellone referred him to an orthopedist.

Mr. Aymond saw orthopedist Dr. Ronald Sylvest on October 7, 2009,[14] reporting a pop in his right knee and acute pain when the accident occurred.  He denied previous right knee injury, pain, or swelling but said that his right knee "gives out."  He had a full range of motion in his back and hips, no spasm or splinting in his back, and no sacroiliac tenderness.  There was no effusion, redness, or increased warmth in his right knee, but Mr. Aymond complained of pain over the medial joint line.  He had full extension but increased pain with flexion.  Dr. Sylvest's impression was anterolateral rotary instability of the right knee.  He ordered an MRI and released Mr. Aymond to return to full work duty without restrictions.

An October 8, 2009, MRI of the right knee showed a bone marrow contusion of the lateral tibial plateau without fracture, probable partial thickness tear involving the proximal ACL, and a ruptured popliteal fossa cyst.[15]

Mr. Aymond saw Dr. Sylvest again on October 14, 2019,[16] reporting increased pain when climbing stairs and getting out of his truck.  Physical examination findings

---

[14]     Rec. Doc. 9-1 at 643.

[15]     Rec. Doc. 9-1 at 318.

[16]     Rec. Doc. 9-1 at 642.

were the same as before, but the MRI showed a partial tear of the proximal aspect of the ACL with no obvious tear in the medial or lateral menisci.  Dr. Sylvest advised Mr. Aymond to take Advil for his pain, prescribed physical therapy, and released him to return to return to work without restrictions.

On October 29, 2009,[17] Mr. Aymond complained to Dr. Sylvest of right knee pain that was now radiating down his leg and up into his hip.  Dr. Sylvest opined that Mr. Aymond had failed conservative care and required ACL reconstruction. When Mr. Aymond saw Dr. Sylvest for his preoperative visit on November 5, 2009, he reported that he could not walk on his leg and complained of severe pain with flexion and extension of his knee.[18]

On November 9, 2009,[19] Dr. Sylvest performed a diagnostic arthroscopy of the right knee with arthroscopic-assisted ACL reconstruction using anterior tibialis allograft with partial lateral meniscectomy, and abrasive chondroplasty of the lateral femoral condyle.

When Mr. Aymond saw Dr. Sylvest on November 11, 2009,[20] he complained of swelling in his knee and itching in his leg but stated that overall he was doing

---

[17]    Rec. Doc. 9-1 at 640.

[18]    Rec. Doc. 9-1 at 639.

[19]    Rec. Doc. 9-1 at 310-313.

[20]    Rec. Doc. 9-1 at 638.

well.  Dr. Sylvest advised him to walk as tolerated, to attend physical therapy, and to return in one week for suture removal.  At Select Physical Therapy on the same date, Mr. Aymond reported right knee pain that he rated 10/10.  The plan was for him to have physical therapy three times a week for six weeks.

When Mr. Aymond saw Dr. Sylvest on November 19, 2009,[21] his wounds were healing well, his neurovascular examination was intact, he had a solid endpoint to Lachman testing, and no calf pain or swelling.  X-rays showed good positioning of the internal fixation screws.  His sutures were removed, and the wound was dressed.  Dr. Sylvest stated that Mr. Aymond could return to work in a light duty capacity with no climbing or prolonged walking.

On November 23, 2009, Mr. Aymond saw Dr. Elemer Raffai, an orthopaedic surgeon, for a second opinion.[22]  Examination showed well healed wounds, a limited range of motion from 0-90 degrees, and normal pulses.  X-rays showed good alignment of the bone and screws.  Dr. Raffai's impression was right knee pain.  He stated that Mr. Aymond needed to stay off work for now and go to physical therapy.

When Mr. Aymond was still having pain in his right knee On December 7, 2009,[23] Dr. Raffai suspected that the biopen in his knee might have backed out.  But

---

[21]     Rec. Doc. 9-1 at 307, 634.

[22]     Rec. Doc. 9-1 at 633,636.

[23]     Rec. Doc. 9-1 at 632.

x-rays did not show anything, and his range of motion was improving. Dr. Raffai recommended an MRI and continued physical therapy. An MRI on December 17, 2009[24] showed a moderate sized Baker's cyst as well as possible degenerative changes postdating the surgical ACL repair.

On December 22, 2009,[25] Mr. Aymond told Dr. Raffai that his knee had been popping. Dr. Raffai noted that the MRI showed the ACL was intact but there was some fluid in the knee. He thought the biopen might have backed out and would need to be excised.

Mr. Aymond returned to Dr. Raffai on January 5, 2010, and January 18, 2010,[26] with the same complaints. Dr. Raffai again recommended that he continue physical therapy and stated that the biopen should be excised.

On January 26, 2010,[27] Dr. Raffai surgically removed the head of the biopen in Mr. Aymond's right knee so that it was then flush with the bone.

On February 15, 2010,[28] Mr. Aymond was doing better and the wound looked good. Staples were removed, and he was to continue physical therapy.

---

[24]     Rec. Doc. 9-1 at 629.

[25]     Rec. Doc. 9-1 at 628.

[26]     Rec. Doc. 9-1 at 627, 625.

[27]     Rec. Doc. 9-1 at 625.

[28]     Rec. Doc. 9-1 at 624.

On March 10, 2010,[29] Mr. Aymond told Dr. Raffai that his right knee had given out and he fell, injuring both knees. He had point tenderness, stiffness, and swelling. He was given an injection of Depo 80 mg in the right knee, an MRI of the right knee was ordered, he was to return for evaluation of his left knee, and he was to continue physical therapy.

On April 21, 2010,[30] Mr. Aymond again complained to Dr. Raffai of right knee pain. Dr. Raffai noted that the MRI showed the ACL was intact but there was some arthritis. He planned to refer Mr. Aymond to pain management and planned to see him again in a month to reassess.

Mr. Aymond complained to Dr. Raffai of bilateral knee pain on June 2, 2010,[31] July 5, 2010,[32] July 28, 2010,[33] and August 16, 2010.[34] Physical examination showed point tenderness and stiffness. Duragesic patches were prescribed, an MRI of the left knee was planned, and Mr. Aymond was advised to continue physical therapy.

---

[29]    Rec. Doc. 9-1 at 621.

[30]    Rec. Doc. 9-1 at 620.

[31]    Rec. Doc. 9-1 at 619.

[32]    Rec. Doc. 9-1 at 618.

[33]    Rec. Doc. 9-1 at 617.

[34]    Rec. Doc. 9-1 at 616.

When Mr. Aymond followed up with Dr. Raffai on August 25, 2010,[35] he had knee pain, tenderness, and swelling.  He was to continue physical therapy.

On September 16, 2010, Mr. Aymond returned to Dr. Raffai,[36] complaining of bilateral knee pain.  Point tenderness and stiffness were noted.  Depo 80 mg was injected into both knees, and he was to continue physical therapy.

The record contains no evidence of further treatment before Mr. Aymond's date last insured, and there is no evidence establishing a back impairment, a shoulder impairment, or depression prior to Mr. Aymond's dated last insured.

On February 14, 2011, Dr. Malcom Stubbs prescribed an ACL brace for Mr. Aymond.[37]  On that same date, Dr. Stubbs released Mr. Aymond to "return to sedentary work, light work."[38]  Imaging of Mr. Aymond's right knee on March 21, 2017, showed evidence of the prior ACL repair and mild degenerative changes.[39]

On August 30, 2018,[40] Mr. Aymond was seen at Acadiana Practitioners, LLC in Port Barre, Louisiana.  He complained about back pain, left knee pain, and right

---

[35]    Rec. Doc. 9-1 at 615.

[36]    Rec. Doc. 9-1 at 614.

[37]    Rec. Doc. 9-1 at 40.

[38]    Rec. Doc. 9-1 at 42.

[39]    Rec. Doc. 9-1 at 489.

[40]    Rec. Doc. 9-1 at 391-396.

knee pain.  Examination showed that he had a normal gait and station.  His left knee was normal except for crepitus.   His right knee was stable, but Mr. Aymond complained of pain with flexion and extension and crepitus.  His lumbar spine and thoracic spine were tender.  Mobic was prescribed.  The same findings were reported at visits to Acadiana Practitioners on September 13, 2018, November 26, 2018, April 17, 2019, May 3, 2019, May 10, 2019, June 5, 2019, September 4, 2019, and December 11, 2019.[41]    Mr. Aymond's subsequent treatment need not be summarized.

Mr. Aymond attended a hearing on June 2, 2020.  It was apparent that his attorney was not prepared for the hearing, and there was a great deal of confusion regarding what evidence was and was not in the record.  The ALJ continued the hearing, and it recommenced on September 15, 2020.  Mr. Aymond testified that he injured his right knee in a workplace incident, tearing the ACL, and necessitating surgery.  He said that the surgeon released him to light duty work six days after the first surgery, which was too soon.  He then began treating with Dr. Raffai, who performed a second surgery, removing or reseating a pin in his right knee.  He testified that, because of the right knee injury, he started putting most of his weight on his left knee, injuring it.  This, he claimed, caused a recurrence of back problems.

---

[41]        Rec. Doc. 9-1 at 351-369, 385-390, 501-514, 523-539.

He testified that he did not get better after the second surgery. He claimed that, at the time of the hearing, his knees gave out on him at least three times a week, causing him to fall. He stated that physical therapy did not help his knees. He stated that he was in constant pain, stayed aggravated all the time, and could not sit, stand, or walk for long periods of time. He stated that he laid down at least three times each day and had trouble getting to sleep at night. He stated that he could not climb ladders and contended that his balance was not right. He said that if he squatted down, he needed to hold onto something to get back up. He testified that he settled his workers' compensation claim in January 2014 and could not see a doctor thereafter because he had no insurance, only Medicaid.

On January 4, 2021, Mr. Aymond's counsel wrote to the Appeals Council, stating that some of Dr. Raffei's treatment notes and the records of Doctors Stubbs, Blanda, and Hodges from 2011 and 2012 had not been included in the record.[42] The Appeals Council decided not to exhibit those documents, finding that there was no reasonable probability that they would change the Commissioner's decision.

The claimant now seeks reversal of the Commissioner's adverse ruling.

---

[42]    Rec. Doc. 9-1 at 282.

## Analysis

### A.    Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[43] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[44] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[45]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[46]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from reweighing the evidence or substituting its judgment for that of the Commissioner.[47]  Conflicts in

---

[43]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[44]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[45]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[46]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[47]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

the evidence[48] and credibility assessments[49] are for the Commissioner to resolve, not the courts. Four elements of proof are weighed by the court in determining whether substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education, and work experience.[50]

## B.    Entitlement to Benefits

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[51] A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[52] A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but

---

[48]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[49]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[50]    *Wren v. Sullivan*, 925 F.2d at 126.

[51]    See 42 U.S.C. § 423(a). See, also, *Smith v. Berryhill*, 139 S.Ct. 1765, 1772 (2019).

[52]    42 U.S.C. § 1382c(a)(3)(A).

cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[53]

## C.    <u>Evaluation Process and Burden of Proof</u>

A sequential five-step inquiry is used to determine whether a claimant is disabled, which considers whether the claimant (1) is currently engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment enumerated in the relevant regulations; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[54]

Before going from step three to step four, the claimant's residual functional capacity[55] is evaluated, by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[56]  The claimant's residual functional capacity is used at the fourth step to determine if he

---

[53]    42 U.S.C. § 1382c(a)(3)(B).

[54]    20 C.F.R. § 404.1520; *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018).

[55]    20 C.F.R. § 404.1520(a)(4).

[56]    20 C.F.R. § 404.1545(a)(1).

can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[57]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[58]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[59]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[60]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[61]

## D.    **The ALJ's Findings and Conclusions**

In this case, the ALJ determined, at step one, that Mr. Aymond has not engaged in substantial gainful activity since September 29, 2009.  This finding is supported by substantial evidence in the record.

---

[57]    20 C.F.R. § 404.1520(e).

[58]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[59]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[60]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[61]    20 C.F.R. § 404.1520(a)(4); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

At step two, the ALJ found that Mr. Aymond did not have a severe impairment. Having made this finding at Step Two, the ALJ did not proceed to Steps Three, Four, or Five.

**E.    <u>The Allegations of Error</u>**

The claimant contends that the ALJ erred (1) in failing to find that Mr. Aymond is disabled; (2) in failing to find that Mr. Aymond was disabled for a closed period of time; (3) in failing to find that Mr. Aymond's testimony was fully credible; and (4) in failing to give proper weight to the opinions of Mr. Aymond's treating physicians. Mr. Aymond also argued that the Appeals Council erred in finding that substantial evidence supported the ALJ's decision.

**G.    <u>Did the ALJ Err in Failing to Find Mr. Aymond Disabled?</u>**

Mr. Aymond argued that the ALJ erred in failing to find him disabled. This is the ultimate issue to be decided and is too broad a topic to properly be considered as an assignment of error.

**H.    <u>Did the ALJ Err in Failing to Find Mr. Aymond Disabled During a Closed Time Period?</u>**

Mr. Aymond argued that the ALJ should have found him disabled for a closed period of time. In a closed period case, the ALJ determines that a new applicant for disability benefits was disabled for a finite period of time that started and stopped

before the decision was rendered.[62]  Benefits may be awarded for a closed period of disability when a claimant experiences medical improvement in a previously disabling condition and becomes able to engage in substantial gainful activity.[63] Thus, the ALJ must determine that the claimant became disabled and then must employ the decision-making process used in termination cases to decide that the claimant's disability had ended and when that occurred.[64]

In this case, however, Mr. Aymond never explained when he thought a closed period of disability would have terminated.  He did not argue that his condition had ever improved, arguing instead that his condition had only worsened over time. Accordingly, Mr. Aymond did not prove that he was entitled to recover benefits during a closed period of disability, and the ALJ did not err in failing to consider a closed period.[65]

## I.    <u>Did the ALJ Err in Failing to Find Mr. Aymond Fully Credible?</u>

Mr. Aymond argued that the ALJ erred in finding that his testimony and complaints were not fully credible.  The ALJ found that Mr. Aymond's "medically

---

[62]    *Waters v. Barnhart*, 276 F.3d 716, 719 (5th Cir. 2002) (citing *Pickett v. Bowen*, 833 F.2d 288, 289 n. 1 (11th Cir. 1987)).

[63]    *Teague v. Astrue*, 342 F. App'x 962, 963-64 (5th Cir. 2009).

[64]    *Waters v. Barnhart*, 276 F.3d at 719.

[65]    See *Gros v. Commissioner of Social Security*, No. 6:20-CV-01076, 2021 WL 6286716, at *7 (W.D. La. Dec. 8, 2021), report and recommendation adopted, 2022 WL 57454 (W.D. La. Jan. 5, 2022).

determinable impairments could have reasonably been expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent for the reasons explained in this decision."[66]   An ALJ's assessment of a claimant's credibility is generally accorded great deference.[67]   In fact, the ALJ, as the administrative fact finder, is entitled to determine the credibility of medical experts as well as lay witnesses and to weigh their opinions and testimony accordingly.[68] The ALJ's "evaluation of the credibility of subjective complaints is entitled to judicial deference if supported by substantial record evidence."[69]   The absence of objective factors can justify the conclusion that a witness lacks credibility.[70]

In support of this argument, Mr. Aymond pointed out an MRI that showed degenerative joint disease and a Baker's cyst as well as a treatment note showed that he received a steroid injection.   The ALJ noted that same evidence in his ruling.   But that evidence does not establish functional impairments sufficient to preclude Mr. Aymond from working.   The mere existence of an illness or condition is not

---

[66]   Rec. Doc. 9-1 at 23.

[67]   *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000).

[68]   *Scott v. Heckler*, 770 F.2d at 485.

[69]   *Villa v. Sullivan*, 895 F.2d at 1024.

[70]   *Dominguez v. Astrue*, 286 Fed. App'x 182, 187 (5th Cir. 2008) (citing *Hollis v. Bowen*, 837 F.2d at 1385).

disabling; instead, there must be evidence that the claimant's functionality is impaired.[71]  For a person to be found to be disabled, his medical condition must result in functional impairments that prevent him from working.[72]  The evidence cited by Mr. Aymond provides no insight into his functionality.  Additionally, the record contains a significant gap in treatment, which Mr. Aymond admits was four years and four months long.[73]  An ALJ may rely on lack of treatment as evidence that an applicant's subjective complaints are not credible.[74]  Accordingly, this Court finds that, in this case, the ALJ's credibility determination is supported by substantive evidence in the record.

## J.   <u>Did the ALJ Properly Weigh the Medical Opinions?</u>

Mr. Aymond suggested that the ALJ failed to properly weigh the medical opinions, but he did not point out any medical opinion that was given too much weight nor did he point out any medical opinion that was given insufficient weight. This argument consequently lacks evidentiary substance.

---

[71]    *Hames v. Heckler*, 707 F.2d at 165.

[72]    *Hames v. Heckler*, 707 F.2d at 165 (the claimant "must show that she was so functionally impaired. . . that she was precluded from engaging in any substantial gainful activity.").

[73]    Rec. Doc. 13 at 6.

[74]    *Quintanilla v. Astrue*, 619 F.Supp.2d 306, 321 (S.D. Tex. 2008) (citing *Cornett v. Astrue*, 261 Fed. App'x 644, 650 n. 3 (5th Cir. 2008) (citing *Villa v. Sullivan*, 895 F.2d at 1024)).  See, also, *Doss v. Barnhart*, 137 F. App'x 689, 690 (5th Cir. 2005).  A gap in treatment is also a relevant factor in determining the severity of an impairment.  *Palomo v. Barnhart*, 154 Fed. App'x 426, 430 (5th Cir. 2005).

**K.    Does Mr. Aymond Meet a Listing?**

In this case, the ALJ did not get to Step Three of the sequential analysis; therefore, he did not consider whether Mr. Aymond meets a listing. Although Mr. Aymond did not assign this as an error by the ALJ, he argued that the ALJ should have found that he meets the criteria for Listings 1.17 and 1.18.

"For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."[75] If a claimant meets this burden, he is disabled. Mr. Aymond did not list the criteria for Listings 1.17 and 1.18 nor did he explain how he meets any of the criteria for those listings. He did not cite to any evidence in the record that is relevant to a listing. Thus, he did not satisfy his burden of proving that he meets the listing criteria.

This Court further notes that the criteria for Listing 1.17 includes a documented medical need for a walker, bilateral canes, bilateral crutches, or a wheeled and seated mobility device involving the use of both hands, while the criteria for Listing 1.18 includes that same need as an alternative to loss of use of one or both upper extremities.[76] There is no evidence in the record that Mr. Aymond

---

[75]    *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). See, also, *Russo v. Saul*, 805 Fed. App'x 269, 273 (5th Cir. 2020).

[76]    20 C.F.R. Pt. 404, Subpt. P, App. 1, Listings 1.17(C) and 1.18(D)(1).

requires any such assistive devices or that he lost the use of an upper extremity before his date last insured.  Therefore, Mr. Aymond did not prove that he meets either cited listing.

**L.**     **Did the Appeals Council Err?**

Mr. Aymond's final assignment of error is that the Appeals Council erred in finding that there was substantial evidence in the record to support the ALJ's decision.  But Mr. Aymond offered no argument or evidence in support of this contention.

The Appeals Council stated that Mr. Aymond submitted additional evidence after the ALJ rendered his decision, which consisted of seventeen pages of records from Lafayette Joint and Bone Clinic, dated January 24, 2011 through February 14, 2011.  The Appeals Council discounted this evidence on the basis that it "does not show a reasonable probability that it would change the outcome of the decision."[77] The Appeals Council chose not to exhibit this evidence.  Implicit in that decision is the fact that the evidence postdated Mr. Aymond's date last insured.  "[N]ew evidence must. . . pertain to the contested time period and not merely concern a subsequently acquired disability or the deterioration of a condition that was not previously disabling."[78]

---

[77]     Rec. Doc. 9-1 at 6.

[78]     *Leggett v. Chater*, 67 F.3d 558, 567 (5th Cir. 1995).

21

Disability insurance benefits are available only for disabilities that arise while the claimant is insured.[79]  Thus, in order to be eligible for Social Security disability benefits, a claimant must establish that he became disabled before his insured status expired.[80]  The claimant bears the burden of establishing a disabling condition before the expiration of his insured status.[81]  If an impairment becomes disabling after the expiration of the claimant's insured status, a finding of disability cannot be made.[82]  Therefore, evidence showing a degeneration of a claimant's condition after the expiration of his insured status is not relevant to the disability analysis.[83]  "Records describing a claimant's current condition cannot be used to support a retrospective diagnosis of disability absent evidence of an actual disability during the time of insured status."[84]

Here, Mr. Aymond was diagnosed with a torn ACL, and he underwent two surgical procedures to remedy that condition while he was insured.  He had some

---

[79]    *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992); *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

[80]    See, e.g., *McLendon v. Barnhart*, 184 Fed. App'x 430, 431 (5th Cir. 2006).

[81]    *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990).

[82]    *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986).

[83]    *Fabian v. Berryhill*, 734 Fed. App'x 239, 243 (5th Cir. 2018).  See, also, *Torres v. Shalala*, 48 F.3d 887, 894 n. 12 (5th Cir. 1995).

[84]    *McLendon v. Barnhart*, 184 Fed. App'x at 432.

residual pain and a restricted range of motion in that knee, and he also complained about pain in his left knee.  These complaints were treated with steroid injections shortly before his insured status expired.  There was no further treatment during the relevant time period, and the record evidence does not establish that Mr. Aymond was unable to work at that time.  Indeed, a few months later, in February 2011, Dr. Stubbs opined that Mr. Aymond was able to return to light or sedentary work. Nothing in the record contradicts that opinion.  Instead, Dr. Stubbs's opinion is consistent with Dr. Sylvest's earlier opinion.

Furthermore, there is no evidence in the record that Mr. Aymond received treatment for his injured knee for a period of years after he received the steroid injections.  Several years later, in 2017, an MRI of Mr. Aymond's right knee showed the ACL repair and mild degenerative changes.  Treatment notes from Mr. Aymond's primary care provider in 2018 consistently showed that his left knee was normal and that his right knee was stable but flexion and extension were restricted due to alleged pain.  This Court therefore finds that the Appeals Council did not err in finding that the ALJ's decision was based on substantial evidence in the record.

### **Conclusion and Recommendation**

For the reasons fully discussed above, this Court recommends that the Commissioner's decision should be AFFIRMED and this matter should be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[85]

Signed in Lafayette, Louisiana, this 1st day of February 2022.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[85]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).